# IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| | | |
|---|---|---|
| BARRETT BUSINESS SERVICE, INC., | ) | |
| d/b/a ENTERPRISE MASONRY, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | C.A. No. N19A-11-011 DCS |
| v. | ) | |
| | ) | |
| ROBERT EDGE, | ) | |
| | ) | |
| Appellee. | ) | |

Submitted: October 9, 2020
Decided: October 29, 2020

*Upon Appeal from the Industrial Accident Board–*
**REVERSED AND REMANDED**

## OPINION

Nicholas Bittner, Esquire, Attorney for Appellant.
Timothy E. Lengkeek, Esquire, Attorney for Appellee.

**STREETT, J.**

## Introduction

Barrett Business Service, Inc., d/b/a Enterprise Masonry, ("Employer"; "Appellant") appeals the Industrial Accident Board's (the "Board") decision on remand that a stroke suffered by Robert Edge (the "Claimant"; "Appellee") was caused by a work-related accident.

The Board issued an initial decision holding that Claimant's stroke was caused by a work-related accident. Employer appealed that initial decision to this Court. This Court reversed the Board's decision and remanded the matter, holding that the Board did not make, or articulate, findings on causation[1]. On remand, the Board found that Claimant's stroke was caused by the work-related accident.

Employer is now appealing the Board's decision on remand to this Court. Employer contends that the Board committed legal error, abused its discretion, and its findings were not supported by substantial evidence. Claimant contends that the Board's decision is free from legal error and supported by substantial evidence.

This Court finds that the Board erred by failing to permit new expert witness testimony on the issue of causation. Therefore, the Board's decision is **REVERSED** and **REMANDED**.[2]

---

[1] The current judge did not handle the original appeal or remand order.

[2] Although Employer raised several issues, the Court's focus is on the issue of additional expert witness testimony.

**Statement of Facts**

On May 11, 2017, at approximately 8:45 a.m., Claimant, while working for Employer, fell off of a scaffold onto the ground six to eight feet below. There were no eyewitnesses. After the fall, Claimant was able to walk, told coworkers that he had hurt his hip, and filled out an accident report. Claimant also sustained a cut near his left eye that had been caused by his safety glasses. An ambulance was called for Claimant and he was transported to the hospital.

At approximately 10:25 a.m., less than two hours after the fall, Claimant arrived at the emergency room. While stitches were being applied to the cut near his left eye, Claimant suffered a transient ischemic attack ("TIA") which is also called a mini-stroke. The medical professionals took aggressive measures to reduce Claimant's significantly high (213/143) blood pressure. A tissue plasma activator ("TPA"), also called a clot buster, was administered.[3] The TPA caused a rapid drop in Claimant's blood pressure which starved Claimant's brain of blood and severely exacerbated Claimant's stroke.[4]

Later that day, at approximately 6:00 p.m., Claimant was taken to surgery. The surgeon found that two of Claimant's cerebral arteries were substantially

---

[3] Employer's medical expert, Dr. Stephen L. Fedder, explained that a TPA, or clot buster, "break[s] up an acutely formed clot and prevent[s] the addition of more clots." Dr. Fedder's Second Deposition, at 18.

[4] It is undisputed that the rapid blood pressure drop exacerbated conditions leading to the stroke.

occluded. Although the surgeon removed two clots and then implanted a stent, Claimant became disabled and is in a wheelchair as a result of the stroke.

## Procedural History

On October 3, 2017, Claimant filed a Petition to Determine Compensation Due to establish that his stroke was causally related to the work accident. Employer disputed that the stroke was caused by the work accident.

### a. *The Board's Initial Decision*

On March 23, 2018, a hearing on Claimant's Petition was held before the Board. Dr. John B. Townsend testified, by deposition, as the medical expert witness for Claimant. Dr. Stephen L. Fedder testified, by deposition, as the medical expert witness for Employer.

Claimant did not present any live witnesses. Employer's live witnesses were William Ritter, foreman for Employer; Kyle Furtaw, project manager and safety coordinator for Employer; and Rhonda Malatesta, financial controller for Employer.

In his deposition testimony on behalf of Claimant, Dr. Townsend testified that he is board certified in neurology.[5] Dr. Townsend examined Claimant on November 14, 2017.[6] Claimant was unable to speak and Claimant's companion spoke to Dr.

---

[5] Dr. Townsend's Deposition, at 5.

[6] *Id.* at 5.

3

Townsend on behalf of Claimant.[7]  Dr. Townsend testified that Claimant was a smoker prior to the accident but his history did not show any other past medical issues or prior accidents.[8]

Dr. Townsend observed that Claimant was in a wheelchair, could only say "oh," and was unable to read.[9]  Claimant also had a flaccid paralysis of the right arm. The record also reflected that Claimant requires help with dressing, needs help with tasks that involve the right side of his body, and requires assistance going to the bathroom (although Claimant can walk with the assistance of a quad cane and can feed himself).[10]

Additionally, Dr. Townsend diagnosed Claimant as having expressive aphasia (unable to get words out), receptive aphasia (difficulty in understanding what was being said to him), and apraxia (not being able to figure out how to do simple tasks).[11]  Dr. Townsend opined that these symptoms were consistent with a left hemisphere stroke.[12]

---

[7] *Id.* at 7.

[8] *Id.* at 7–8.

[9] *Id.* at 23.

[10] *Id.* at 7, 23.

[11] *Id.* at 23.

[12] *Id.*

Dr. Townsend reviewed the medical records relating to the accident and emergency room visit. He stated that the records show that Claimant had fallen eight feet from a scaffolding, his blood pressure was elevated (213/143) when he arrived at the hospital, he had "what looked like a black eye with a laceration right next to the eye on the left side of his face", and he had tenderness to his left shoulder and hip.[13] Dr. Townsend opined that the injuries suggested that Claimant fell onto his left side and onto his face.[14]

According to the records, the emergency room staff decided to close the cut on Claimant's face with stitches.[15] While the stitches were being applied, Claimant developed slurred speech, a stutter, and difficulty uttering words.[16] The doctors noted Claimant's high blood pressure and that Claimant was reporting new "clumsiness" in his right hand.[17]

Dr. Townsend testified that the emergency room doctors then activated its stroke alert procedure.[18] A CT angiogram performed on Claimant showed a mild

---

[13] *Id.* at 9–10.

[14] *Id.* at 10.

[15] *Id.*

[16] *Id.*

[17] *Id.* at 10-11.

[18] *Id*. at 11.

5

buildup of plaque in the right internal carotid artery and mixed plaque that was calcified and non-calcified on the left side at the carotid bifurcation.[19] The records also showed that a new clot was blocking the blood vessel in the left carotid artery.[20] Claimant was then seen by a stroke neurologist who decided that Claimant should be given a TPA (a clot buster)[21] and Claimant's blood pressure would be lowered with an IV infusion of blood pressure medicine.[22]

Dr. Townsend stated that Claimant "became acutely aphasic and his right extremity became flaccid"[23] while the blood pressure medication was being administered to Claimant. Claimant's stroke-like symptoms increased as his blood pressure dropped.[24] Dr. Townsend explained the reason for this occurrence:

> [I]n the case of somebody that has a long-standing high blood pressure, when you acutely drop the pressure, the cerebral blood flow has a certain type of regulatory process where it – the brain likes to maintain the blood flow at a very even level, but when you get to a certain blood pressure level, it drops off dramatically. And in patients with normal blood pressure taken down to 130 systolic blood pressure, which is the upper number, wouldn't have much of an effect on the cerebral blood flow. In this case with the person having high blood pressure likely for a period of time, you suddenly drop their blood pressure to 130, which

---

[19] *Id.*

[20] *Id.* at 13.

[21] *Id.* at 15.

[22] *Id.*

[23] *Id.* at 15–16.

[24] *Id* at 16.

wouldn't be a big deal for a normal person, you're going to put him on the rapid drop-off and make his cerebral blood drop dramatically over a very narrow range of blood pressure, which is likely what happened here…

…

… And if you already don't have blood flow to an area because of a clot there, if you suddenly take blood pressure, or take away the cerebral blood flow, then more area is going to be affected, and you get the effect of getting a bigger stroke.[25]

Dr. Townsend testified that the emergency room staff then increased Claimant's blood pressure to the 160 range after noticing that Claimant's symptoms worsened after the treatment.[26]  Around 6:00 p.m. later that day, another CT angiogram was performed on Claimant.[27]  According to Dr. Townsend, this CT "showed a long segment of occlusion in blood vessels above the level of the blockage, which suggests that the clot broke off from that, a big clot, and went further north, which likely produced the additional strokes."[28]  After the CT, a procedure was performed on Claimant and a stent was inserted after removal of a clot from the carotid artery and a large fragment of embolic clot.[29]

---

[25] *Id.* at 16–17.

[26] *Id.* at 17.

[27] *Id.* at 18.

[28] *Id.*

[29] *Id.* at 19–20.

In Dr. Townsend's opinion, Claimant's fall off the scaffolding more likely than not caused or contributed to his stroke.[30] Dr. Townsend stated that Claimant would not have suffered the massive stroke but for the fall off of the scaffolding.[31]

Dr. Townsend explained:

[The fall] could have caused stretching of the carotid artery, which could have caused a fracture of the preexisting plaque, which would then give rise to more thrombus, which could then embolize into the upper blood vessels. Or that the fall caused a direct trauma to the carotid artery, which then had a tear in the area of the preexisting plaque, which gave rise to the thrombus, which then gave rise to his stroke.[32]

In addition, Dr. Townsend offered that Claimant's very high blood pressure rate at the emergency room was, in part, related to his pain that was caused by the work accident.[33] Dr. Townsend explained that it would have been reasonable for the emergency room staff to try to lower his blood pressure but not "down quite as far as they got it while treating him."[34] Dr. Townsend stated:

So, it's my opinion that there are issues that occurred as a result of the fall likely increasing his blood pressure. The fact that he potentially hyperextended his neck and had evidence for a new thrombosis in an area where he's had a persistent blood clot all points to the fact that the

---

[30] *Id* at 44.

[31] *Id.* at 47.

[32] *Id.* at 44–45.

[33] *Id*. at 46.

[34] *Id.* at 47.

8

work-related injury did play a substantial role in his developing the stroke following the injury.[35]

He also testified that the several-hour delay in the stroke symptoms would be consistent with this type of an injury.[36]

Testifying on behalf of Employer by deposition, Dr. Fedder said that he is a neurological surgeon, he conducted a comprehensive examination of Claimant on December 19, 2017 while Claimant's son was present, he reviewed the available pertinent medical records, and he relied upon this examination and the records to reach his opinion.[37] Dr. Fedder's opinion is that the fall and the stroke are unrelated.[38]

Dr. Fedder testified that Claimant reported in the Employee Report of Injury or Illness that he fell, primarily, on his hip, shoulder, and elbow.[39] Dr. Fedder opined that the emergency room's "clinical assessment coupled with the accurate and clear penmanship of [Claimant] in his employee statement supports an intact neurologic examination and a grossly architecturally stable spine."[40] He added that this opinion

---

[35] *Id.* at 51–52.

[36] *Id.* at 52.

[37] Dr. Fedder's Deposition, at 5, 8–12.

[38] *Id*. at 12.

[39] *Id.* at 13.

[40] *Id.* at 13–14.

9

was supported by imaging.[41]  Dr. Fedder explained that "[t]he initial CAT scan of [Claimant] at 12 o'clock was essentially normal other than swelling around the laceration of his left lateral orbital area, and the CT scan of his cervical spine done in the emergency room does not identify fracture or dislocation."[42]

Dr. Fedder stated that Claimant had a longstanding history of hypertension that set him up to have a stroke.[43]  He explained that Claimant's "hypertension was longstanding and unfortunately untreated, leading [Claimant] to the serious condition he was in."[44]  He also testified that Claimant "obviously had many strokes before" the date of the accident.[45]  Dr. Fedder also stated that there was no evidence that Claimant's injuries impacted either the carotid or vertebral arteries in the neck.[46]

In addition, Dr. Fedder asserted that the emergency room records showed no evidence of neurological deficits at the time of admission.  He also said that the subsequent neurological deficit were not related to the "relatively minor fall."[47]

---

[41] *Id*. at 14.

[42] *Id.*

[43] *Id*. at 15.

[44] *Id*. at 16–17.

[45] *Id.* at 16.

[46] *Id.* at 20.

[47] *Id*. at 25.

Dr. Fedder described Claimant's presentation as being significantly neurologically impaired and unable to communicate in a meaningful way, other than to give a thumbs up or thumbs down.[48] Claimant indicated that he was a daily smoker of one to two packs of cigarettes a day (although he had stopped smoking by the time of the examination).[49] Claimant also attends physical therapy sessions three times a week and is taking several medications, post-stroke, for hypertension.[50]

Dr. Fedder provided his diagnostic impression in relation to the work accident.[51] He testified that Claimant had sustained a "scalp laceration, left shoulder and left hip contusion."[52] Concerning the stroke, Dr. Fedder stated that it "is an independent event related to [Claimant's] clear history of longstanding and unrelated hypertension and tobacco usage."[53]

Dr. Fedder based this conclusion on Claimant's documented history of hypertension, an EKG that demonstrated signs of left ventricular strain from hypertension, and CT scans that showed evidence of prior strokes. He also pointed

---

[48] *Id.* at 23.

[49] *Id.* at 24.

[50] *Id.*

[51] *Id.* at 29.

[52] *Id.*

[53] *Id.*

out that Claimant "did not have signs or symptoms of any neurologic event at the time of his fall from the scaffolding."[54] Claimant did not lose consciousness, was able to bear weight, filled out his statement in neat penmanship, provided a history, and did not manifest any neurological abnormalities until 12:45 p.m.[55] He also noted that the records showed no evidence to support a diagnosis of traumatic brain injury, including a concussion, related to the work accident.[56]

In Dr. Fedder's opinion, the stroke was unrelated to the fall but was exacerbated by the effort in the emergency room to lower Claimant's blood pressure. Dr. Fedder explained:

> When you have longstanding, untreated hypertension, your body gets used to it and it becomes necessary in order [to] maintain perfusion to the brain, particularly when perfusion of the brain is compromised by significant atherosclerotic stenosis and/or occlusion of the major feeding blood vessels to the brain. When you reduce the blood pressure in a person like that, even to levels that would still be considered elevated, they fall below the ability of the brain's cerebrovascular regulatory capacity and causes ischemic changes and vascular embarrassment of the brain, leading to the situation that happened here.[57]

---

[54] *Id.* at 32.

[55] *Id.* at 32–33.

[56] *Id.* at 34.

[57] *Id.* at 31.

Dr. Fedder disagreed with Dr. Townsend's contention that the fall could have caused an embolism to break loose from the carotid artery at the time of the fall.[58] Dr. Fedder opined that if that were the case, Claimant "would have manifested with a stroke at the time of the fall" instead.[59]

Mr. Ritter, Claimant's coworker, testified that he was present at the job site on the morning of the fall, he heard somebody yell but did not see Claimant fall, and Claimant told him that his shoulder and side were hurting but did not complain of any head or neck pain.[60] Claimant also had a small cut near his eye that was bleeding (Mr. Ritter thought that the cut came from Claimant's safety glasses).[61] Mr. Ritter said that prior to the accident Claimant was wearing a harness, a hard hat (the hard hat had fallen to the ground during the accident), and safety glasses.[62]

Mr. Ritter testified that Claimant stated that he was "okay," he did not ask for medical treatment, and he was a little drowsy but seemed fine otherwise.[63] Mr. Ritter also said that Claimant was standing and walking with the help of other people.[64]

---

[58] *Id*. at 45.

[59] *Id.*

[60] The Board Hearing of April 19, 2019, at 100.

[61] *Id.*

[62] *Id.*

[63] *Id.* at 101.

[64] *Id.*

Additionally, Mr. Ritter said that he was aware that Claimant was a longtime smoker, previously reported headaches while at work, and previously asked for Tylenol (twice several months before the accident).[65] Mr. Ritter did not have knowledge of Claimant's blood pressure rate or any prior falls.[66]

Kyle Furtaw, the project manager and Employer's safety coordinator, testified that he arrived at the scene of the accident shortly after it occurred.[67] Mr. Furtaw testified that Claimant complained of pain to his left side and left leg, had a laceration to his eye,[68] and was a "little shaken up."[69] Claimant did not complain to Mr. Furtaw of head or neck pain.[70] Claimant was then taken to the hospital in an ambulance and Mr. Furtaw followed the ambulance.[71] At the hospital, Claimant complained about his left leg and the doctors closed the cut near his eye with stitches.[72]

---

[65] *Id.* at 102.

[66] *Id.* at 103.

[67] *Id.* at 108.

[68] Although Mr. Furtaw testified that the laceration was to Claimant's eye, other testimony indicate that the laceration was near the eye.

[69] *Id.* at 109.

[70] *Id.*

[71] *Id.* at 110.

[72] *Id.*

Mr. Furtaw stated that he witnessed the onset of Claimant's mini-stroke, which occurred approximately two hours after they arrived at the hospital.[73] Mr. Furtaw said that the doctors questioned Claimant about whether he knew what was going on and Claimant had trouble speaking.[74] Mr. Furtaw testified that the doctor said that the mini-stroke did not have a correlation to the work accident.[75] Mr. Furtaw testified that he did not know whether Claimant had hit his head during the accident.[76] He also stated that someone on the hospital staff (he did not remember the individual's name or position) told him that the Claimant's blood pressure was the cause of the TIA (mini-stroke).[77]

Rhonda Malatesta testified that she handles workers compensation claims for Employer and is on its safety committee.[78] She stated that Claimant had a prior claim relating to a previous fall off of scaffolding that had occurred around 2013.[79] There was no allegation of a stroke related to the first fall. Ms. Malatesta testified

---

[73] *Id.* at 112.

[74] *Id*. at 113.

[75] *Id.* at 114.

[76] *Id.* at 117.

[77] *Id.* at 118.

[78] *Id.* at 121.

[79] *Id.* at 123.

that she was aware that Claimant had pre-existing high blood pressure and was a longtime smoker.[80]  She also stated that she was aware that Claimant's brother had suffered two strokes.  According to Ms. Malatesta, the Petition was the first time that Employer knew that there was a claim that the stroke was caused by the work accident.[81]

On April 19, 2018, the Board issued its decision granting Claimant's Petition.  The Board ordered that Employer pay Claimant's outstanding medical expenses, attorney's fee in the amount of $8,000.00, and medical witness fees.  The Board also ruled that Claimant would be placed on an open agreement for total disability beginning on the date of the work accident.

The Board determined that the issue was "whether Claimant's stroke was causally related to his fall from a scaffold on May 11, 2017."[82]  In finding that the stroke was causally related to the fall, the Board stated that it relied on the opinion of Dr. Townsend.  It stated that it found Dr. Townsend's testimony to be more reliable than that of Dr. Fedder.

The Board stated that this was a "but for" case, finding that:

The fact that Claimant's hypertension was a pre-existing condition, latent or not, does not matter, he was in the hospital being treated for

---

[80] *Id.* at 124.

[81] *Id.* at 128.

[82] The Board's April 19, 2018 Opinion, at 21.

16

injuries related to the fall at work. Simply put, but for the work accident Claimant would not have been in the emergency room that day ultimately getting treated for hypertension. The Board also finds it credible that Claimant's blood pressure temporarily increased as a result of the accident. This is not a situation where medical opinions differ as both doctors agreed that the treatment of high blood pressure caused a massive stroke… Dr. Townsend specifically noted that were it not for the accident Claimant would not have had the treatment to rapidly reduce his blood pressure.[83]

### b. *Appeal to this Court of the Board's Initial Decision*

On May 16, 2018, Employer filed a Notice of Appeal of the Board's decision. On appeal, Employer argued that the Board ignored the progression and timeline of events while Claimant was in the emergency room. Employer argued that Claimant's treatment and causes for treatment were bifurcated into treatment for his fall and separate treatment for a stroke that happened during his hospital stay that was unrelated to his fall.

On May 1, 2019, this Court reversed and remanded the Board's decision.[84] The Court focused on the issue of causation. The Court found that the expert testimony presented the Board with three choices as to causation:

> 1) the stroke was a coincidence, unrelated to the fall, 2) the fall caused trauma to the carotid artery itself, which caused a stroke, or 3) embolic, non-calcified plaque was loosened by the trauma of the fall, travelled to the carotid artery and was the proverbial straw that broke the camel's back, causing the stroke.[85]

---

[83] *Id*. at 22.

[84] *Barrett Business Services, Inc. v. Edge*, 2019 WL 2070460 (Del. Super. May 1, 2019).

[85] *Id.* at *2.

The Court found that the Board did not adopt any of these choices. The Court noted that the Board simply awarded compensation on the basis that "but for the work accident Claimant would not have been in the Emergency Room that day ultimately getting treated for hypertension"[86] although all of the experts agreed that the TPA (clot buster) dramatically increased the severity of the stroke.

The Court held that the central question put to the Board was whether the work accident caused the stroke but "[t]he Board made no finding whether the [stroke] was caused by the workplace accident" or "whether the treatment for hypertension was related to the workplace accident."[87]

The Court also found that the Board and Claimant's expert did not relate the increase in blood pressure to the stroke. In addition, the Court wrote that, although the Board found that the TPA (clot buster) caused Claimant's blood pressure to drop dramatically which caused "dramatic effects" on the stroke, "the Board did not make a finding whether and how the administration of the TPA was a result of the accident."[88]

The Court concluded:

---

[86] *Id.* at \*3.

[87] *Id.*

[88] *Id.*

The Court does not presume that the Board intended to set new precedent making the Employer the general health insurer of its employees. But in order to sustain the Board's ruling, a reviewing Court must be able to see that the Board has found that "but for" the workplace accident, the stroke and its aftermath would not have occurred. There was at least some expert testimony that this was true, but in adopting the broad approach that it did, the Board did not rely on these expert theories.[89]

In reversing and remanding, the Court held:

The Claimant in this case may be [sic] deserve the compensation ordered in the Board's prior decision. By this Opinion, the Court does not mean to suggest that he is not. The Court remands only because the Board's decision does not articulate findings on causation sufficient to allow the reviewing Court to engage in appellate review of its findings. On the other hand, the Board may determine that it must hear more testimony before it can make its findings on causation.[90]

c. *The Board's Decision on Remand*

On June 6, 2019, the Board held a hearing to determine the course and scope of the remand proceedings.[91] At the hearing, Employer asserted that there is a statutory right at a remand hearing to present new evidence and arguments limited to the reasons why the case was remanded. Employer argued that because the "problematic portion [of the Board's decision] was the expert opinion … [Employer]

---

[89] *Id.*

[90] *Id.* at *4.

[91] Prior to remand, one of the original Board members at the determination proceeding had retired. As such, on remand, the Board included a new Board member. The record does not reflect that Employer raised this issue at or before the remand hearing.

[is] entitled to present new evidence on the expert opinions," including, possibly, new depositions, new experts, and a new defense medical examination ("DME").[92] In addition, Employer contended that it was legally entitled to have Claimant undergo a new DME, whether or not the Board allows it as evidence.[93]

In contrast, Claimant argued that a remand hearing and new evidence were not necessary because the record is complete.[94] Claimant asserted that the Board was merely required to add one sentence to its order stating that Claimant's high blood pressure, caused by the pain from the fall, was being treated in the hospital and led to the stroke.[95] Claimant also argued that, at its discretion, the Board could address whether the trauma of the fall caused a piece of plaque to loosen, causing the stroke.[96] In addition, Claimant asserted that a new DME was not necessary because Claimant's condition had not changed.[97]

On June 18, 2019, the Board issued its order determining the course and scope of the remand proceedings. The Board determined that a hearing would be held, but

---

[92] Hearing to Determine the Scope of Remand Proceedings Transcript, at 8-9.

[93] *Id.* at 7.

[94] *Id.* at 6.

[95] *Id.* at 5.

[96] *Id.*

[97] *Id.* at 10.

limited the hearing to the issue for which the Board's first decision was remanded. The Board found that the "issue for remand is a clarification and explanation of the Board's findings on causation."[98] The Board wrote that the Superior Court held that the Board's decision did not "sufficiently link" the Board's determination of causation to "the opinions of Claimant's medical expert, Dr. John Townsend."[99] As such, the Board limited the evidence to this issue.

In its order, the Board held that:

> The parties may obtain updated testimony from their medical experts to address the medical causation issue however the Board notes that, based on the decision on appeal, there is limited relevance (if any) for other fact witnesses. Put simply the evidence presented must relation to how Claimant's stroke could have been causally related to his fall at work medically.[100]

The Board also found that another DME would not be relevant because the issue on remand did not concern Claimant's current medical condition. Therefore, the Board concluded that it was not reasonable to require Claimant to undergo another DME.

On September 27, 2019, the Board held the remand hearing. Employer submitted an updated deposition from its expert, Dr. Fedder. Claimant did not

---

[98] The Board's Order to Determine the Scope of the Remand Proceedings, at 2.

[99] *Id.*

[100] *Id.* at 2–3.

present an updated deposition of its expert, Dr. Townsend. Consistent with the Board's order, there were no additional witnesses.

In the updated deposition, Dr. Fedder again testified that Claimant's stroke was not related to the work accident. He opined that Claimant would have suffered a stroke regardless of the work accident and that it was just a coincidence that he suffered a stroke several hours after the work accident.[101] He stated that: "I don't see a medical basis for linking the stroke to the … physiologically minor work event."[102] He concluded that the stroke was caused by "the accumulated damage of years of untreated and significant hypertension" and that there was no evidence that the work accident accelerated any condition that led to the stroke.[103] He also said that the treatment for the work accident injuries was not responsible for causing Claimant's stroke.[104]

Dr. Fedder maintained that Claimant did not sustain a traumatic brain injury or concussion.[105] He pointed out that Claimant's employee incident report (completed on the day of the accident but before the stroke) reflected that Claimant's

---

[101] Dr. Fedder's Second Deposition, at 21, 34–35.

[102] *Id.*

[103] *Id.* at 32.

[104] *Id.* at 34.

[105] *Id.* at 7–8.

penmanship was legible, neat, and accurate.[106] He also suggested that the emergency room staff did not perform imaging of Claimant's head when he first arrived because "there was nothing to suspect intracranial processes."[107] In addition, Claimant was able to provide his history to the emergency room staff.[108]

Dr. Fedder also described the fall as "physiologically minor."[109] He observed that Claimant sustained a "scalp laceration" without intracranial bleeding or fractures, a contusion to the left shoulder without fractures, and trauma to his left hip without fractures.[110] Additionally, he said that there was no evidence that the fall caused a tear in Claimant's blood vessel.[111]

Dr. Fedder also testified that the fall did not affect Claimant's blood pressure.[112] He stated that Claimant's blood pressure was high before the accident[113] and pointed out that Claimant had a long history of hypertension.[114] In addition, and

---

[106] *Id.*

[107] *Id.* at 20.

[108] *Id.*

[109] *Id.* at 19.

[110] *Id.* at 19–20.

[111] *Id.* at 23.

[112] *Id.* at 8.

[113] *Id.* at 10.

[114] *Id.*

consistent with a history of hypertension, Dr. Fedder explained that the CT scan showed that Claimant had a prior stroke in the right thalamus, several small vessel disease strokes in the remainder of the brain, chronic left carotid occlusion, and significant atherosclerosis of the intracranial arteries.[115] Additionally, Dr. Fedder stated that Claimant did not see a family doctor on a regular basis and was not taking medication for hypertension.[116] He considered Claimant's high blood pressure to be an event that was independent to the accident.

Dr. Fedder also said that, even if the fall resulted in an increased blood pressure, the TPA (clot buster) was not administered in response to the accident.[117] Dr. Fedder explained that the TPA was administered in response to Claimant's neurologic deficits that occurred a couple of hours after Claimant arrived at the emergency room.[118]

Dr. Fedder disagreed with the Board's finding (in its original decision) that treatment for Claimant's high blood pressure began immediately upon presentation to the emergency room.[119] Dr. Fedder testified that the records showed that Claimant

---

[115] *Id.* at 8–9.

[116] *Id.* at 8.

[117] *Id.* at 19.

[118] *Id.*

[119] *Id.* at 12.

arrived at the emergency room at 10:34 a.m. but that he did not receive significant intervention with his blood pressure until 12:45 p.m.[120] Dr. Fedder stated that the blood pressure treatment was administered when it was determined that Claimant was a candidate for TPA (clot busters).[121]

Concerning the issue as to whether Claimant's high blood pressure caused the stroke, Dr. Fedder testified that Claimant's high blood pressure set the stage for his stroke.[122] He stated that high blood pressure was "the causal factor, and certainly the medical basis for all the many strokes that were present in the brain" before the accident.[123] In his opinion, the stroke was not an acute stroke caused by an acute hypertensive crisis.[124] Furthermore, Claimant had preexisting risk factors for a stroke[125]— significant hypertension[126] and a history of tobacco use.[127]

---

[120] *Id.*

[121] *Id.*

[122] *Id.* at 13.

[123] *Id.*

[124] *Id.* at 14.

[125] *Id.* at 21–22.

[126] *Id.* at 22.

[127] *Id.*

Concerning Dr. Townsend's argument that the stroke was a delayed result of trauma to Claimant's carotid artery, Dr. Fedder asserted that such cases are "extraordinarily rare."[128] He testified that he had seen less than ten cases of acute trauma causing a stroke.[129] Dr. Fedder maintained that the work accident was not associated with intracranial trauma or neck trauma and there was no evidence of stretching of the carotid artery.[130]

On October 22, 2019, the Board issued its decision on remand. The Board, again, found in favor of Claimant.[131] The Board acknowledged that the case was remanded because the Court found that the Board "did not provide an adequate record for appellate review by failing to provide conclusions linked to one of the causation theories espoused by Claimant's expert, Dr. Townsend."[132]

The Board stated that it was not convinced that the accident caused Claimant's blood pressure to increase. It wrote that the testimony that the pain from the accident increased Claimant's blood pressure was "speculative and insufficient to Claimant's

---

[128] *Id.* at 28.

[129] *Id.* at 31.

[130] *Id.* at 26, 31.

[131] The Board mailed its decision on October 29, 2019.

[132] The Board's October 22, 2019, Opinion, at 25.

burden of proof."[133]  The Board pointed out that there was no evidence that provided

Claimant's baseline blood pressure prior to the accident that could be compared to

Claimant's blood pressure after the accident.

Nevertheless, the Board found for Claimant because Dr. Townsend had

testified "that the fall at work caused the preexisting arteriosclerosis or plaque to

move or break off ultimately resulting in the stroke."[134]  The Board wrote:

> Dr. Townsend testified that there was evidence of calcified or old
> plaque as well as evidence of non-calcified or newly formed plaque.
> This evidence demonstrates that something happened on that morning
> which ultimately resulted in the new occlusion at the bifurcation which
> caused a massive stroke.  Dr. Townsend provided studies as evidence
> that the symptoms can have a delayed onset when an artery is injured.[135]

The Board concluded that Dr. Townsend's viewpoint, "while not the strongest

evidence, is sufficient to carry Claimant's burden of proof."[136]  The Board noted that

"[m]edical evidence stating a possibility of causation is sufficient when combined

with other evidence tending to show causation."[137]  The Board reasoned:

> Dr. Townsend's opinion that the fall may have caused an injury to the
> artery combined with the fact that Claimant was not having any
> symptoms related to hypertension and carotid artery disease prior to the

---

[133] *Id.* at 26.

[134] *Id.* at 27.

[135] *Id.*

[136] *Id.*

[137] *Id.*

accident rises above the minimum evidentiary threshold for Claimant to meet his burden to prove his stroke was causally related to the work accident. Consequently, the Board finds Claimant's stroke causally related to the compensable work accident and awards Claimant medical expenses and ongoing disability.[138]

The Board also awarded Claimant $3,750.00 in attorney's fees, in addition to the $8,000.00 awarded in the Board's initial decision. The Board took into account the attorney's fees customarily charged in the locality and found that this amount represented a reasonable fee.

d. *Appeal to this Court of the Board's Decision on Remand*

On November 26, 2019, Employer filed a Notice of Appeal of the Board's second decision.

On February 10, 2020, Employer filed its Opening Brief.

On February 20, 2020, Claimant filed his Answer.

On February 27, 2020, Employer filed its Reply.

**Parties' Contentions**

Employer contends that the Board committed legal error and abused its discretion when it denied Employer's request to introduce "new, relevant testimony" on "the question of the medical cause of the stroke and whether it had any relation to the work accident."[139] Employer asserts that the Board should have allowed new

---

[138] *Id.* at 28.

[139] Employer's Opening Brief, at 17.

evidence, a new hearing was required because one of the original hearing officers was absent from the remand hearing, and that attorney fees should not have been awarded. Employer also contends that the Board's decision was not supported by substantial evidence.

Employer asserts that the law requires that a party be allowed to present additional evidence on the problematic issue (medical causation) on remand at the remand hearing.[140]  Employer argues that, concerning the issue of causation, it "determined that an additional medical expert was needed from a different medical specialty."[141]  However, the Board limited Employer "to re-deposing the same medical expert it had used previously."[142]

In addition, Employer argues that a substitute Board member at the remand hearing who did not participate in the original hearing was improper.  Employer states that the original Board heard testimony from three live witnesses, which provided information of Claimant's history, the accident, and Claimant's appearance and demeanor after the accident.  Employer argues that this testimony was critical and the new Board member should have been "afforded the opportunity to scrutinize

---

[140] *Id*. at 19, citing *Morris James LLP v. Weller*, 2018 WL 1611267 (Del. Super. Mar. 29, 2018); *Johnson Controls v. Haines*, 1999 WL 743570 (Del. Super. Aug. 17, 1999).

[141] *Id.* at 20.

[142] *Id.*

the witnesses, including the opportunity to ask questions directly."[143]  Employer explains that the Board's decision that the stroke was caused by the work accident "is only legitimate if the [C]laimant sustained a meaningful blunt trauma to the head or neck."[144]  Employer argues that the live testimony is necessary to determining whether that trauma to the head or neck occurred.

Employer also argues that the substitution of a Board Member made it impossible for the Board to clarify its prior decision, making a *de novo* hearing necessary.  Employer explains that it is "impossible for the Board to clarify its reasoning and conclusions because one-half of the decision making body is no longer available to provide such clarifications."[145]

The last legal error alleged by Employer concerns the Board's decision to award Claimant attorney's fees in the amount of $3,750.00 on remand, in addition to the $8,000.00 attorney's fees awarded at the original hearing.  Employer argues that Claimant should not have received additional attorney's fees for the remand hearing because Claimant "received no additional benefit."[146]

---

[143] *Id.* at 21.

[144] *Id.*

[145] *Id.*

[146] *Id.* at 24, citing *Playtex Prods. v. Woodall*, 2004 WL 2735455, at *7 (Del. Super. Oct. 7, 2004).

In addition to the alleged legal errors and abuse of discretion, Employer contends that the Board's decision was not supported by substantial evidence. Employer writes that the Board stated that it relied on Claimant's expert's opinion that the fall "caused the preexisting arteriosclerosis or plaque to move or break off ultimately resulting in the stroke."[147]  However, Employer points out that Claimant's expert was more equivocal, saying that the fall "*could* also stretch the carotid artery upwards and backwards, that *could* produce an issue within the clot, or cause a clot to break off and go further upstream."[148]

Employer also challenges Claimant's expert's statement that "we know that he fell on the left side of his head and struck the lateral part of his face" because there is no evidence that Claimant fell on his head.[149]   Employer notes that the testimony established that Claimant fell on his hip, a witness testified that he did not know whether Claimant hit his head, and Claimant's own incident report states that he impacted his hip, should, and elbow (and did not mention head).

Employer also contends that the Board's findings from the original hearing and the findings from the remand hearing are contradictory.  Employer states that the Board's original decision found that Claimant "did not sustain direct trauma to

---

[147] *Id.*

[148] *Id.* at 26 (emphasis in Employer's Opening Brief).

[149] *Id.*

the carotid artery"[150] but the Board's remand decision accepted Claimant's expert's opinion that the fall may have caused an injury to Claimant's carotid artery. Employer writes that, "[w]ithout direct trauma to the head, neck, or carotid artery, [Claimant's expert's] entire opinion is rendered baseless and not grounded in reality."[151]

Employer also asserts that, while Claimant's expert based his opinion on "mere speculation," Employer's expert "repeatedly and thoroughly disproved [Claimant's expert's] contentions by citing to the actual studies and tests performed on the Claimant, including confirmation that there was no new plaque."[152]

Employer further asserts that Claimant's expert's testimony was focused on the general population and not specifically on Claimant. Employer also points out that the studies relied upon by Claimant's expert show that it is extremely rare that a stroke is caused by acute trauma and that the expert failed to reconcile this extreme rarity with the facts of the case. Employer additionally argues that the expert committed a logical fallacy by opining that the lack of symptoms before the fall suggests that the stroke was related to the fall.

---

[150] *Id.* at 27.

[151] *Id.*

[152] *Id.* at 28.

Claimant asserts that the Board's order determining the scope of the remand hearing complied with this Court's mandate on remand and, therefore, should be affirmed.[153]  Claimant argues that, on remand, the Board properly limited the evidence to the issue that this Court identified as problematic, namely causation.[154]  Claimant argues that the Court only remanded because it required additional findings of facts on Claimant's theory of causation and that that Board was merely required to flesh out the arguments that the parties had made at the first Board hearing. Claimant contends that, by granting Employer's request for a new hearing with updated depositions and additional argument, "the Board went above and beyond what was required under this Court's mandate…"[155]  In a footnote, Claimant asserts, without elaboration, that "retaining new experts would go well beyond the matter on remand."[156]

---

[153] Claimant's Answer, at 8.  Claimant cites the following text as the instructions from this Court's prior decision:

> The Court remands only because the Board's decision does not articulate findings on causation sufficient to allow the reviewing Court to engage in appellate review of its findings. On the other hand, the Board may determine that it must hear more testimony before it can make its findings on causation. *Barrett Business Services, Inc. v. Edge*, 2019 WL 2070460, *4 (Del. Super. May 1, 2019).

[154] Claimant's Answer, at 9, citing *Johnson Controls v. Haines*, 1999 WL 743570 (Del. Super. Aug. 17, 1999).

[155] *Id*. at 10.

[156] *Id*. at 8, n.1.

Concerning the attorney's fee, Claimant asserts that Employer has cited no authority that supports its position that attorney's fees are not available when there is a new hearing. Claimant argues that a fee is warranted for the remand hearing because "there was a benefit conferred on the Claimant by the Board's hearing and the Remand Order."[157] Claimant also contends that Employer's argument concerning the attorney's fee should be rejected because Employer failed to raise an objection below.

Claimant additionally asserts that the Board's decision to accept Claimant's expert's testimony over Employer's expert's testimony constitutes substantial evidence supporting the Board's findings for the purposes of appellate review. Claimant argues that a claimant meets the threshold for causation when "medical evidence stating a possibility of causation when combined with other evidence tending to show causation" is presented.[158] Claimant notes that his expert testified "that the injury to his face or neck when he fell off the scaffolding more likely than not caused or contributed to [Claimant's] stroke."[159] Claimant argues that his expert

---

[157] *Id*. at 10–11, citing *Willingham v. Kral Music, Inc*., 505 A.2d 34, 36 (Del. Super. 1985).

[158] *Id.* at 11.

[159] *Id.*

"applied well-accepted medical principles to Claimant's specific medical condition."[160]

Claimant also contends that the Board is allowed to adopt the opinion testimony of one expert over another, which constitutes substantial evidence for appellate review. Claimant writes that, "[h]aving heard from both experts, the Board accepted [Claimant's expert's] causation opinion over [Employer's expert's] opinion."[161]

### **Standard of Review**

This Court's review of the Board's decision is "limited to examining the record for errors of law and determining whether substantial evidence supports the Board's factual findings."[162] Questions of law are reviewed *de novo*. Substantial evidence means "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[163] Substantial evidence "requires less than a preponderance of the evidence, but more than a mere scintilla."[164] This Court is precluded from weighing the evidence, determining questions of credibility, or

---

[160] *Id.* at 14.

[161] *Id.*

[162] *Blair v. Smyrna School District*, 2019 WL 1530127, at *3 (Del. Super. Apr. 5, 2019).

[163] *Id.*

[164] *Gregg v. State*, 2016 WL 4530614, at *4 (Del. Super. Aug. 29, 2016) (internal quotation marks removed).

making its own factual findings,[165] and it "must consider the record in a light most favorable to the party prevailing below."[166] The Court will affirm the Board's decision if it is supported by substantial evidence and is free from legal error "even if the Court might have, in the first instance, reached the opposite conclusion."[167]

## Discussion

Employer asserts that the Board committed several legal errors, abused its discretion, and that its findings of fact were not supported by substantial evidence. This Court finds merit to Employer's argument that the Board erred by not permitting new expert witnesses on the issue of medical causation when requested by Employer.[168]

---

[165] *Stevens v. State*, 802 A.2d 939, 944 (Del. Super. May 23, 2002).

[166] *Weitzel v. State*, 2016 WL 4249766, at *5 (Del. Super. Aug. 9, 2016).

[167] *Id.*

[168] Employer's contention that the Board's decision constitutes legal error or an abuse of discretion on the basis that one of the Board members at the remand proceedings had not participated in the original Board decision is without merit. Employer has provided no authority for its position that a *de novo* proceeding is required when there is a substitution of an officer and a transcript is available.

In addition, Employer's argument that the Board was required to permit the live lay witnesses to provide new testimony in the presence of the new Board member also lacks merit. The Board was not required to permit the live witnesses to testify on remand because those witnesses were laypersons and did not testify concerning medical causation, which was the problematic issue on remand. *Johnson Controls, Inc. v. Haines*, 1999 WL 1568334, at *1 (Del. Super. Oct. 12, 1999) (The Court held that on remand the Board is only required to revisit the issue identified by the Court as problematic.). Moreover, the relevant testimony of the live witnesses has not been disputed.

In *State v. Steen*[169], an appeal from the Industrial Accident Board, the Delaware Supreme Court held that, when 19 *Del. C.* § 2350(b)[170] and 19 *Del. C.* § 2348(f)[171] (at the time § 2348(d)) are read together, "the statutory scheme for conducting a hearing on remand is unambiguous."[172] The Court explained that "[t]he Board is to decide the matter, after the remand hearing, on the basis of the evidence from the prior hearing plus any new evidence and legal arguments the parties decide to present."[173] In *Johnson Controls, Inc. v. Haines*, also an appeal from the Industrial Accident Board, this Court clarified the *Steen* holding, stating that "*Steen* does not

---

[169] *State v. Steen*, 719 A.2d 930, 934 (Del. 1998).

[170] 19 *Del. C.* § 2350(b) states:

> In case of every appeal to the Superior Court the cause shall be determined by the Court from the record, which shall include a typewritten copy of the evidence and the finding and award of the Board, without the aid of a jury, and the Court may reverse, affirm or modify the award of the Board or remand the cause to the Board for a rehearing. In case any cause shall be remanded to the Board for a rehearing, the procedure and the rights of all parties to such cause shall be the same as in the case of the original hearing before the Board.

[171] 19 *Del. C.* § 2348(f) states:

> Whenever a cause shall be remanded to the Board for a rehearing, all evidence theretofore taken before the Board in a previous hearing or hearings shall become part of the evidence in the hearing upon remand.

[172] *State v. Steen*, 719 A.2d 930, 934 (Del. 1998).

[173] *Id.*

37

require the Board to hear the entire case anew on remand, but rather, allows the parties to revisit the issue identified by this Court as problematic."[174]

More recently, this Court, again, addressed the issue in *Morris James LLP v. Weller*, which was also an appeal from the Industrial Accident Board.[175] The Court explained that, pursuant to § 2350(b), "it appears on remand of a workers' compensation claim that all evidence previously taken becomes part of the record on remand, and that the parties may augment that record by offering additional evidence or legal argument."[176] Citing *Steen* and *Johnson Control*, this Court held that "on remand parties are entitled to introduce new evidence and new legal argument with respect to the issue identified as 'problematic.'"[177]

In the Instant Case, the problematic issue, for which the matter was remanded, was the Board's failure to make, or articulate, findings on medical causation.[178] Employer had "determined that an additional medical expert witness was needed

---

[174] *Johnson Controls, Inc. v. Haines*, 1999 WL 1568334, at *1 (Del. Super. Oct. 12, 1999).

[175] *Morris James LLP v. Weller*, 2018 WL 1611267, at *4 (Del. Super. Mar. 29, 2018).

[176] *Id.*

[177] *Id.*

[178] The Court concluded that the Board, in its initial decision, "made no finding whether the [stroke] was caused by the workplace accident" or "whether the treatment for hypertension was related to the workplace accident." *Barrett Business Services, Inc. v. Edge*, 2019 WL 2070460, at *3 (Del. Super. May 1, 2019). The Court also stated that it remanded the case because "the Board's decision does not articulate findings on causation sufficient to allow the reviewing Court to engage in appellate review of its findings." *Id*. at *4.

38

from a different medical specialty" on the issue of causation. The record shows that Employer requested permission to call new expert witnesses in addition to being allowed to obtain a new deposition for its original expert.[179] In its Order, the Board held that "[t]he parties may obtain updated testimony from their medical experts to address the medical causation issue however the Board notes that, based on the decision on appeal, there is limited relevance (if any) for other fact witnesses."[180] As such, the Board did not provide permission for Employer to call new expert witnesses on causation, precluding Employer from so doing.

The case law is clear that the Board must permit new evidence on the problematic issue on remand.[181] Here, the record shows that Employer requested

---

[179] At the hearing, Employer argued, "because the problematic portion [of the Board's original decision] was expert opinions, under the statute and case law we are entitled to present new evidence on expert opinions." The Hearing to Determine the Scope of the Remand Proceedings Transcript, at 8. Employer then argued that this new evidence could mean "new depositions" and, also, that it "could even mean **new experts** if the parties see fit because this all goes into the expert opinions." *Id.* at 8-9 (emphasis added). Employer also requested "that we be permitted to a remand hearing on the issue of the expert opinions and that we be allowed to bring in new depositions, **new experts**, new evidence in accordance with the abundance of case law." *Id.* at 9 (emphasis added).

[180] The Board's June 19, 2019 Order, at 2-3. The Board also stated: "Put simply the evidence presented must relate to how Claimant's stroke could have been causally related to his fall at work medically." *Id.* at 3. The Board's Order is somewhat ambiguous, in that it does not explicitly states that new expert witnesses are not allowed. However, at the very least, the Board did not fully address Employer's request for permission to bring in new expert witnesses, and the Order appears to have had the effect of precluding new expert witnesses.

[181] Indeed, in its order, the Board stated that "the weight of the case law supports the party requesting a hearing on remand to present new evidence and argument" and that the evidence can be limited to the issue on remand, which the Board identified as medical causation. The Board's June 19, 2019 Order, at 2. However, the Board then proceeded to deny (or ignore) Employer's request for new evidence (in the form of experts) on the issue of medical causation.

permission to call new expert witnesses on the problematic issue (medical causation). Because the Board failed to permit new expert witnesses on causation when requested, it committed legal error.[182] Therefore, reversal and remand are warranted on this ground.[183]

As the Board's decision is reversed and remanded, and additional expert witnesses may testify on causation, this Court declines to address Employer's argument that the Board's findings of fact are not supported by substantial evidence.[184] In addition, it would be inappropriate for the Court to make a decision

---

[182] Claimant does not cite legal authority for the position that the Board was not required to allow requested new expert witness testimony on causation at the remand hearing. Instead, Claimant suggests, in a footnote, that the record does not support Employer's assertion that it had requested new experts (Claimant states that the Board's order does not reference such a request and that Employer's Opening Brief does not cite to the record where the request was made). *See* Claimant's Answer, at 8, n. 1. However, as discussed in this Opinion, the transcript of the hearing to determine the scope of the remand proceedings shows that Employer did request permission to have new experts (and Employer cites to the transcript in its Reply). The Hearing to Determine the Scope of the Remand Proceedings Transcript, at 8. In addition, Claimant merely asserts (without elaboration) that, assuming arguendo that Employer had made such a request, "retaining new experts would go well beyond the matter on remand." Claimant's Answer, at 8, n. 1. However, Claimant does not explain why the retention of new experts on causation would go beyond the matter on remand when causation was the matter on remand.

[183] Contrary to Employer's contention, the Board is not required to conduct a *de novo* proceeding on remand; instead, it is required to allow "the parties to revisit" the issue of causation. *Johnson Controls, Inc. v. Haines*, 1999 WL 1568334, at *1 (Del. Super. Oct. 12, 1999) ("*Steen* does not require the Board to hear the entire case anew on remand, but rather, allows the parties to revisit the issue identified by this Court as problematic.").

[184] *See Barrett Business Services, Inc. v. Edge*, 2019 WL 2070460, at *4 (Del. Super. May 1, 2019) (In its first Opinion, this Court declined to review the substance of Claimant's claim and reversed and remanded the matter to the Board for further proceedings to properly address the issue of causation).

on attorney's fee at this time.[185]  However, when determining attorney's fees, the

Board must keep in mind that it is required to follow the statutory limitations.[186]

## Conclusion

Accordingly, the Board's ruling is **REVERSED** and **REMANDED** for such

further proceedings as the Board may deem necessary consistent with this Opinion.

**IT IS SO ORDERED.**

/s/ Diane Clarke Streett_____
Diane Clarke Streett, Judge

---

[185] *Playtex Prod., Inc. v. Woodall*, 2004 WL 2735455, at *2 (Del. Super. Oct. 7, 2004) ("19 Del. § 2320(10) allows an employee to collect reasonable attorney's fees if they were awarded compensation.  The legislative purpose of this section was to relieve a successful claimant of the legal fees and expenses necessary to obtain his just compensation.  Compensation under the statute has been defined broadly as to include any benefit or favorable change in the employee's position.").

[186] 19 *Del. C.* § 2320(10)(a) states:

> A reasonable attorneys' fee in an amount not to exceed 30 percent of the award or 10 times the average weekly wage in Delaware as announced by the Secretary of Labor at the time of the award, whichever is smaller, shall be allowed by the Board to any employee awarded compensation under Part II of this title and taxed as costs against a party. In order for the Board to award a fee under this section, counsel for an employee shall submit to the Board an Attorneys' Fee Affidavit in a form prescribed by or substantially in compliance with Board rules, along with a copy of the written fee agreement signed by the employee. Any fee awarded to an employee under this paragraph shall be applied to offset the fees that would otherwise be charged to the employee by that employee's attorney under the fee agreement.